IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

JAYE LEIGH THOMAS,

Defendant.

CRIMINAL ACTION FILE
NO. 4:13-CR-22-RLV-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Jaye Leigh Thomas's Motion to Suppress Statements [12]. On October 25, 2013, the Court conducted an evidentiary hearing [30] regarding the instant Motion, which has been transcribed [32]. The parties have briefed the matter. (See Br. Supp. Mot. Suppress Statements [37] ("Def.'s Br."); Gov't Resp. [39].) On the basis of the testimony and documentary evidence produced at that hearing and the briefs of counsel, the undersigned **REPORTS** that police took Mr. Thomas into custody and failed to provide him with Miranda warnings before an interrogation that yielded potentially incriminating responses. Immediately thereafter, police administered Miranda warnings and obtained a knowing and voluntary waiver and voluntary statements from defendant. Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress

Statements [12] be **GRANTED** as to his pre-Miranda statements and **DENIED** as to his post-Miranda statements.

## I.    STATEMENT OF FACTS

### A.    Defendant's Arrest

Law enforcement agencies, including the Whitfield County Sheriff's Office ("WCSO") and the Federal Bureau of Investigation ("FBI"), investigated Mr. Thomas for approximately two and a half years.  (Tr. 4-6.)  On January 29, 2013, WCSO Detective José Rivera procured a warrant authorizing defendant's arrest for trafficking more than 28 grams of crack cocaine in violation of O.C.G.A. § 16-13-31.[1]  (Id. at 4, 6-7; Gov't Ex. 1 (Aff. & State Warrant for Arrest)[2].)  The Dalton Police Department executed the warrant at 12:21 a.m. on January 30, 2013.  (Tr. 7.)  Defendant was apprehended without incident, transported to the WCSO, and booked.  (Id. at 7-8.)  Defendant was not questioned at the time of his arrest.  (Id. at 8.)

---

[1] "Any person who sells, manufactures, delivers, or brings into this state or who is in possession of 28 grams or more of cocaine or of any mixture with a purity of 10 percent or more of cocaine . . . in violation of this article commits the felony offense of trafficking in cocaine . . . ."  O.C.G.A. § 16-13-31(a)(1) (2013).

[2] A Whitfield County magistrate judge issued the warrant for defendant's arrest.  (Tr. 7; see Gov't Ex. 1.)  Detective Rivera averred in the warrant affidavit that defendant had willfully possessed and controlled 159 grams gross weight of crack cocaine.  (Gov't Ex. 1.)

### B.    Pre-*Miranda* Statements

Around 1:00 a.m. on January 30, 2013, defendant was moved to the facility's training room for questioning.  (Tr. 8-9.)  The training room is roughly twenty by thirty feet in dimension, furnished with several rows of tables and 50 to 75 chairs.  (Id. at 9; see Gov't Ex. 3 (photograph of the training room).)  Detective Rivera, Detective Daniel Rann (also of the WCSO), and FBI Special Agent ("Agent") Tim Coakley conducted the interview.[3]  (Tr. 5-6, 9.)

Before the interview began, Detective Rivera excused himself from the room.  (Audio DVD mark 0:12-0:16; Tr. 11.)  As the others waited, defendant and Detective Rann, members of the same fitness club, small-talked about working out.  (Audio DVD mark 0:52-1:47; Tr. 12, 19-20.)  Upon returning, Detective Rivera, who was also acquainted with Mr. Thomas, removed his handcuffs and asked whether he had been aware "this was coming."  (Audio DVD mark 1:48-2:23; Tr. 12, 20.)  Defendant admitted his apprehension had not come as a surprise.  (Audio DVD mark 2:09-2:11.)

---

[3] The officers recorded the interview.  (See Gov't Ex. 4 (audio DVD recording of the interview).)  At the evidentiary hearing, the Government submitted the audio recording as an exhibit.  (Tr. 18-19.)  Defendant did not challenge its accuracy or authenticity.  (See id.)  The Court has reviewed the audio recording and uses it to supplement the hearing testimony.

3

Without first administering <u>Miranda</u> warnings, Agent Coakley gave defendant an opportunity to cooperate with law enforcement:

> First [thing] we like to do Mr. Thomas is, in a situation like this, no secrets here, you know what's up. . . . [T]ime is of the essence.  And this is a point where you have an opportunity to help yourself, and we'll try to make that happen if it's possible.  And cutting right to the chase that involves you telling us who your source of supply is and us making a case against them.  And do we need to make phone calls now to make that happen.  And I throw that out first before we actually get into talking about your case to see if there's something we can do, in short order.

(Audio DVD mark 2:24-3:13; Tr. 12, 20, 23.)  Defendant rejected the offer, preferring instead to "do [his] 20." (Audio DVD mark 3:15-3:16; Tr. 20-21, 24-25.)

Asked to clarify his prior statement that he had "seen it coming," defendant repeated that he had been "expecting it" and mentioned that "in a different situation, different time" he might have given up a source.  (Audio DVD mark 3:24-3:52.) However, he explained that turning state's witness would be a costly decision:  "I tell you something, people die."  (<u>Id.</u> at 4:26-4:56; Tr. 25.)

### C.   Post-*Miranda* Statements

Agent Coakley then asked Mr. Thomas whether he was willing to answer questions about his case.  (Audio DVD mark 5:00-5:20.)  After defendant gave the officers express permission to interrogate him, Agent Coakley promptly administered

4

<u>Miranda</u> warnings from an Advice of Rights form.  (<u>Id.</u> at 5:21-5:42; Tr. 12-13, 21.)

The "Your Rights" portion of the form, which he read verbatim to defendant,

provides as follows:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Audio DVD mark 5:43-6:10; Tr. 14; <u>see</u> Gov't Ex. 2 (Advice of Rights form).)

Defendant appeared to read along with Agent Coakley's recitation.  (Tr. 16-17.)

Having read defendant his rights, Agent Coakley solicited a waiver of those

rights.  (Audio DVD mark 6:11-6:22.)  He continued, "[a]nd the bottom line is, if

you don't like a question you can tell us to get lost, pound sand, no offense taken.

But before we ask you any questions about the investigation, you need to be aware

of these rights and you have to sign this form agreeing that you'll speak with us." (Id. at 6:26-6:41; see Gov't Ex. 2 (a suspect's signature certifies, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.").)

Defendant objected to signing the form ("I can't do that"), but indicated he would take questions nonetheless.  (Audio DVD mark 6:43-6:55; Tr. 14-15, 21.) According to Detective Rivera, defendant had concerns about placing his signature on file, as it might "get out" that he had signed the form.  (Tr. 15, 28, 32.)

Despite not signing the form, defendant confirmed that he understood his rights and told officers, "If you want to ask me something, I might want to answer." (Audio DVD mark 8:07-8:20; Tr. 13, 15, 21-22, 27.)  The officers proceeded to question defendant.  (Tr. 15.)

Several minutes into the ensuing colloquy, defendant's reluctance to answer questions about dealing drugs prompted Agent Coakley to say, "[s]ounds to me like we could sit and talk all night about anything and everything, but if we ask you questions related to drug distribution you're going to have a hard time answering those questions, is that fair enough?"  (Audio DVD mark 16:36-16:48.)  Defendant stated that he would not "speak on that," but continued to answer questions, and at

no point requested the presence of an attorney or that the officers cease questioning him.  (See id. at 16:49-29:04; Tr. 17, 29, 33.)

During the entire episode, the officers had their firearms holstered and concealed.  (Tr. 10-11, 16.)  No one threatened, enticed with promises, or beat defendant.  (Id. at 11, 16.)  Defendant was not restrained for the duration of the interview and did not complain of any discomfort or medical issue.  (Id. at 11, 17.) He did not appear to be under the influence of drugs or alcohol.  (Id. at 16.)  The interview lasted approximately twenty-nine minutes.  (See Gov't Ex. 4.)

## II.    THE INDICTMENT

On May 8, 2013, the grand jury returned a two-count Indictment [1] against defendant.  Count One alleges that, beginning at an unknown time no later than January 2013, and continuing until January 29, 2013, defendant conspired to knowingly and intentionally possess with the intent to distribute at least 280 grams of a substance and mixture containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii).  (Indict. Count One.)  Count Two charges that, on January 29, 2013, defendant knowingly and intentionally possessed with the intent to distribute at least 280 grams of a substance and mixture

7

containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii).  (Id. Count Two.)

## III.   CONTENTIONS OF THE PARTIES

Mr. Thomas argues that his pre-Miranda statements were the product of a custodial interrogation and are thus inadmissible.  (Def.'s Br. 4.)  Likewise, he contends that statements he made after Agent Coakley read him Miranda warnings must be suppressed, since the officers did not scrupulously honor his invocation of the right to remain silent.  (Id. at 4-6.)

The Government responds that officers did not interrogate Mr. Thomas before administering Miranda warnings; therefore, Miranda warnings were not required and his statements to police are admissible.  (Gov't Resp. 11-13.)  With respect to post-Miranda statements, the Government argues that defendant knowingly and voluntarily waived his right to remain silent.  (Id. at 13-18.)

## IV.   ADMISSIBILITY OF INCRIMINATING STATEMENTS

Before a defendant's confession or self-incriminating statements may be presented to a jury, a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of those statements. Jackson v. Denno, 378 U.S. 368, 376-77 (1964).  Pursuant to 18 U.S.C. § 3501(a),

8

"the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (explaining that § 3501(a) codified the Jackson v. Denno requirement for criminal prosecutions).

In Miranda v. Arizona, 384 U.S. 436, 478 (1966), the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." Therefore, the Court instituted the procedural safeguard of warning the suspect of his constitutional rights in order to guarantee the privilege. Id. at 478-79. So-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

A two-part inquiry governs the admissibility of a confession or self-incriminating statement. First, courts must determine whether the Miranda waiver is valid. A defendant may validly waive his Miranda rights only if the totality of the circumstances show both of the following:  (1) an uncoerced choice and (2)

an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).

Second, even where the Government has complied with the requirements of Miranda, the Court must consider whether the confession or self-incriminating statement was voluntarily made.  United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam).  To determine whether statements were voluntary, the Court must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics."  Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).  The goal of that inquiry is to determine whether police overreached, considering factors such as "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."  Id.  (internal quotations omitted) (alteration in original).

## V.    ANALYSIS

### A.    Defendant's Pre-*Miranda* Statements

Miranda warnings must precede any interrogation of a suspect in custody. Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994).  The parties agree that Mr.

Thomas was in police custody when interviewed, but dispute whether officers initiated interrogation before administering <u>Miranda</u> warnings.  (<u>See</u> Gov't Resp. 11.)

The Supreme Court explored the meaning of the term "interrogation" in <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980):

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[4]

<u>Id.</u> at 300-01 (footnotes omitted).

> On the other hand,
>
> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.  *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* . . .  Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

---

[4] <u>Innis</u> defined "incriminating response" as "any response–whether inculpatory or exculpatory–that the *prosecution* may seek to introduce at trial." 446 U.S. at 301 n.5.

11

Innis, 446 U.S. at 299-30 (quoting Miranda, 384 U.S. at 478); Cannady v. Dugger,

931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments, even

after *Miranda* rights are asserted, are admissible evidence if the comments were not

made in response to government questioning.").  "In determining whether an

exchange was the functional equivalent of an interrogation, the focus of the inquiry

is the perception of the suspect, not the intent of the police." United States v. Suarez,

162 F. App'x 897, 901 (11th Cir. 2006) (per curiam).

Precedent binding upon this Court demonstrates that an officer's attempt to

induce a suspect's cooperation is a functional equivalent of express questioning.  In

United States v. Johnson, 812 F.2d 1329, 1330 (11th Cir. 1986), an FBI agent

offered to explain the stages of federal criminal litigation to the accused, who had

requested that a lawyer be present during questioning.  After the agent described

appearances before a magistrate, the setting of bond, and the appointment of counsel,

the accused made an incriminating statement.  Id.

> While stating to an accused in custody that the criminal justice system
> will be explained sounds innocent enough, those familiar with the
> criminal arena are well aware of the fact that such an "explanation" is
> often designed to inform the accused that cooperation may be beneficial
> when a judicial officer considers such matters as bail.  This type of
> helpfulness is often used to indicate to the accused that the law

12

enforcement officers will "be good if the accused will be good," or infer "Why don't you be good and tell us about it?"

Id. at 1331.  Without expressly applying the Innis standard, Johnson held that the accused's statement was the product of an illegal interrogation.  See id.

The Circuit considered a similar incident in United States v. Gomez, 927 F.2d 1530 (11th Cir. 1991).  After the suspect declined to cooperate with the government and requested counsel, an agent informed him that he could obtain a lighter sentence if he cooperated.  Id. at 1533.  The suspect soon expressed a willingness to cooperate.  Id.  In light of Johnson and Innis, the court held that the agent's statement clearly constituted "interrogation."  See id. at 1537-38.  "[E]mphasizing to the accused the possible harsh sentences and the benefits of cooperation will likely be interpreted by the accused as pressure to respond and 'come clean.'  This is precisely the type of psychological ploy Innis and Miranda sought to prevent."  Id. at 1538. See also United States v. Ramsey, 992 F.2d 301, 305-06 (11th Cir. 1993) (an officer "interrogated" the defendant where he encouraged him to answer questions and told him that this was his opportunity to help himself, and that he would explain the extent of his cooperation to prosecutors); United States v. Valencia-Vergara, No. 8:06-CR-279-T-17TBM, 2007 WL 177790, at *9 n.9 (M.D. Fla. Jan. 19, 2007)

13

(statements made to the defendant about cooperating with the government constituted "interrogation"); United States v. Foreman, 993 F. Supp. 186, 192 (S.D.N.Y. 1998) ("I find that by suggesting that Foreman could do better by speaking with the police, Officer Heber engaged in the functional equivalent of interrogation.  Heber's statement to Foreman that he could help himself by cooperating constitute words that are reasonably likely to elicit an incriminating response from the suspect."); United States v. Ferrara, 990 F. Supp. 146, 155 (E.D.N.Y. 1998) (the defendant was "interrogated" when an officer urged him to cooperate).

The instant matter differs legally from Johnson and Gomez in one respect. Those cases, in which police communicated with the accused after he had invoked his right to counsel, fall within the bright-line rule of Edwards v. Arizona, 451 U.S. 477 (1981).  In Edwards, the Supreme Court held that following a suspect's request for counsel, law enforcement may not resume questioning in counsel's absence unless the suspect himself initiates further communication with the police.  Id. at 484-85; see also Gomez, 927 F.2d at 1539 ("[O]nce an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation.").  Although the Edwards framework

14

directs a special solicitude for suspects who have invoked their right to the counsel's presence, it incorporates the Innis standard.  See Edwards, 451 U.S. at 486 (Innis established that "[a]bsent [custodial] interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.").  In other words, Innis supplies the practical test for determining whether police conduct constitutes interrogation for purposes of applying Edwards.  See Tukes v. Dugger, 911 F.2d 508, 515 (11th Cir. 1990) (Innis defines interrogation where the Edwards rule applies); United States v. Hunter, 708 F.3d 938, 953 (7th Cir. 2013) (neither Miranda nor Edwards "bars consideration of post-request statements that are *not* the product of interrogation") (Tharp, J., dissenting).  Therefore, Gomez and Johnson are fully applicable to the present set of facts.[5]

---

[5] United States v. Montana, 958 F.2d 516 (2d Cir. 1992), illustrates this point. In Montana, an agent working for the Drug Enforcement Administration told the defendants that they could benefit by cooperating with the government.  Id. at 517. Although the Edwards rule was not triggered–none of the defendants had invoked his right to counsel–the court relied on Innis and Johnson to conclude that the agent's "unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted 'interrogation.'"  Id. at 518-19.

Before "Mirandizing" defendant, Agent Coakley offered him an "opportunity to help [himself]."  That offer was contingent upon defendant disclosing the identity of his drug supplier.  In the Government's view, Agent Coakley's overture was unlikely to trigger an incriminating response and thus did not rise to an "interrogation."  (Gov't Resp. 11-12.)  However, if Mr. Thomas had betrayed his source of supply, he necessarily would have implicated himself in a cocaine trafficking conspiracy.  While the Government contends that defendant "could have said yes or no to the agents, without giving any incriminating response" (id. at 12), a simple "yes" here would have been incriminating.  By answering "yes" to an invitation to give up one's source of cocaine, one admits he in fact has a source who supplies him with cocaine.  Furthermore, in arguing that there "were no probing questions" and "Agent Coakley simply explained the process of cooperation" (id.), the Government ignores the Innis standard of "interrogation," which sweeps more broadly than just probing questions, and Johnson and Gomez, which suggest that the cooperation bait is likely to encourage incriminating responses.

The facts here arguably present a stronger case for "interrogation" than Johnson and Gomez.  Agent Coakley solicited the identity of defendant's supplier, whereas the actions of police in Johnson and Gomez were more indirect. The agent's

16

tutorial about the criminal justice system in <u>Johnson</u>, in contrast, seems far less likely to elicit an incriminating remark.

Finally, the undersigned cannot accept the Government's position that defendant's superfluous comments (e.g., "I tell you something, people die.") were spontaneous (Gov't Resp. 12-13) when they were responsive to the tabled offer and the officers prodded defendant into saying more.  See <u>Cannady</u>, 931 F.2d at 754 (spontaneous, volunteered statements are those not made in response to interrogation).

Mr. Thomas was entitled to receive <u>Miranda</u> warnings before he was asked to assist officers in building a case against other players in the local drug trade.  The undersigned **REPORTS** that defendant's pre-<u>Miranda</u> statements were the product of a custodial interrogation and therefore **RECOMMENDS** that the Motion to Suppress be **GRANTED** as to all pre-warning statements.

### B.   <u>Defendant's Post-*Miranda* Statements</u>

#### 1.   <u>Unambiguous Invocation</u>

Once a suspect is read <u>Miranda</u> warnings, he must unambiguously invoke his right to counsel or the right to remain silent in order to terminate police questioning. <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381 (2010); <u>Davis v. United States</u>, 512 U.S.

452, 459 (1994); see also Owen v. Fla. Dep't of Corr., 686 F.3d 1181, 1192-94 (11th Cir. 2012).  "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."   Berghuis, 560 U.S. at 381 (internal citations omitted).  Should a suspect unequivocally invoke his right to remain silent, police must "scrupulously honor" the invocation by cutting off questioning.   Michigan v. Mosley, 423 U.S. 96, 103-104 (1975).

Defendant argues that two indications he made during his interview constitute unambiguous invocations of his right to remain silent.  (Def.'s Br. 4-5.)  First is his refusal to sign the waiver of rights form.  However, "[i]t is well-settled law that a refusal to sign a waiver form is not equivalent to an invocation of rights which would render subsequent questioning improper."  United States v. Grant, No. 1:09-CR-482, 2011 WL 2580867, at *8 (N.D. Ga. May 4, 2011); see Bernal-Benitez, 594 F.3d at 1319 ("[F]ailing to obtain a signed *Miranda* waiver alone is not proof that the defendant did not freely and intelligently waive his rights."); United States v. Acosta, 363 F.3d 1141, 1154 (11th Cir. 2004) ("[A] number of our decisions[] establish that an arrestee's refusal to sign a waiver of rights form is not enough to constitute an

18

invocation of rights."); United States v. Boon San Chong, 829 F.3d 1572, 1574 (11th Cir. 1987) (finding that even when a defendant refuses to sign a waiver of rights form, his uncoerced statement may establish an implied waiver of rights, so long as he understood his rights).

Trying to work around this established precedent, defendant argues that "the statements made by Agent Coakley when presenting the form to [him], demonstrate that the refusal to sign the form was an invocation . . . of his right to remain silent." (Def.'s Br. 4-5; see also Audio DVD mark 6:37-6:41 ("You have to sign this form agreeing to speak with us.").)  The manner in which the agent presented the form, however, cannot override the fact that defendant explicitly permitted the officers to question him.  Moreover, as Detective Rivera explained, defendant declined to sign the waiver form because he did not want his signature on file, not because he was opposed to speaking with police.

Because "[a]ny waiver, express or implied, may be contradicted by an invocation at any time," Berghuis, 560 U.S. at 387-88, the undersigned addresses whether defendant contradicted his initial waiver later in the interview.  The recording demonstrates that after he waived his Miranda rights, Mr. Thomas was reticent to answer questions about his alleged participation in a drug trafficking

19

conspiracy.  When Agent Coakley pointed out that he was deflecting the officers'
questions on that subject, defendant made known that he would not "speak on that."
Defendant argues that this response was an affirmative invocation of his Fifth
Amendment rights.  (Def.'s Br. 5.)

Like Mr. Thomas, the defendant in United States v. Mikell, 102 F.3d 470, 473
(11th Cir. 1996), exercised discretion in responding to police questioning, but never
demanded counsel or that detectives stop interrogating him.  "[A] suspect's refusal
to answer certain questions," held the court, "is not tantamount to the invocation,
either equivocal or unequivocal, of the constitutional right to remain silent and. . .
questioning may continue until the suspect articulates in some manner that he wishes
the questioning to cease."  Id. at 477; see also United States v. Thomas, 176 F. App'x
997 (11th Cir. 2006) (per curiam) ("The refusal to answer a specific question is not
tantamount to an invocation of rights as to other questions."); United States v. Dixon,
No. 1:12-CR-205, 2013 WL 4718934, slip op. at 6 (N.D. Ga. Sept. 3, 2013) (the
defendant's refusal to answer certain questions was not an invocation of his rights).
The court noted that "[a]fter a knowing and voluntary waiver of *Miranda* rights, law
enforcement officers may continue questioning 'until and unless the suspect clearly

requests' that the questioning cease." <u>Mikell</u>, 102 F.3d at 477 (quoting <u>Davis</u>, 512 U.S. at 460).

Here, rather than request that the questioning cease or that his attorney be present, defendant kept responding to questions. Regardless of whether he provided officers with the answers they sought, he was clearly willing to entertain their questions, including questions relating to the charged offenses. As such, a reasonable officer would not have recognized defendant's statement as a request to stop the interrogation. In addition, after defendant refused to answer a particular question, the officers did not press the point and moved on to other queries. Therefore, the undersigned **REPORTS** that Mr. Thomas did not invoke his right to remain silent after receiving <u>Miranda</u> warnings.

### 2. <u>Valid Waiver</u>

The undersigned next addresses whether defendant knowingly and voluntarily waived his right to remain silent. "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [<u>Miranda</u>] rights when making the statement." <u>Berghuis</u>, 560 U.S. at 387. The waiver inquiry has two distinct dimensions:

21

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

Waiver may be established even absent formal or express statements of waiver.  Berghuis, 560 U.S. at 385 (because Miranda "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights" its rights can "be waived through means less formal than a typical waiver on the record in a courtroom"); North Carolina v. Butler, 441 U.S. 369, 373 (1979) (courts can infer a waiver of Miranda rights "from the actions and words of the person interrogated"). In fact, "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police."  Berghuis, 560 U.S. at 388-89.

The record in this case shows that defendant knowingly and voluntarily waived his right to remain silent.  There is no basis to conclude that he did not

understand his rights.  Defendant, who speaks English, received a written copy of the Miranda warnings, had the warnings read aloud to him, appeared to read along during the recitation, and responded affirmatively when asked whether he understood the rights enumerated on the form.  Nor is there any evidence his statement was coerced.  The audio recording reveals no police overreaching during the twenty-nine minute interview.  Rather, the interview was non-confrontational and, because defendant was familiar with a couple of the officers, was relatively casual and relaxed.  No guns were drawn, no physical force was used against defendant, and no promises were extended.  Furthermore, by attempting to induce defendant's cooperation, Agent Coakley did not render defendant's subsequent statements involuntary.  See Williams v. Johnson, 845 F.2d 906, 909 (11th Cir. 1988) (confession not involuntary where officer promised that defendant's cooperation would be made known to the appropriate authorities).  Therefore, defendant knowingly and voluntarily waived his Miranda rights, thereby permitting questioning.

Finally, "even if a court finds compliance with *Miranda*, the court must still rule on the [statement's] voluntariness."  Jarrell v. Balkcom, 735 F.2d 1242, 1252

23

(11th Cir. 1984).   Given the above analysis, the undersigned concludes that defendant's statements were voluntarily made.

In sum, the undersigned **REPORTS** that, considering the totality of the circumstances, defendant made a knowing and voluntary waiver of his Miranda rights, followed by voluntary statements to the officers.   Accordingly, the undersigned **RECOMMENDS DENYING** defendant's Motion to Suppress as to all post-warning statements.[6]

---

[6] The suppression of defendant's unwarned statements does not require the Court to suppress his warned statements.  The Supreme Court, in Oregon v. Elstad, 470 U.S. 298 (1985), rejected the defendant's contention that a second, warned confession must be suppressed because officers failed to administer Miranda warnings before obtaining his first confession.  The Supreme Court explained that it would be an "unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  Id. at 309.  Thus, "Elstad sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made." United States v. Street, 472 F.3d 1298, 1312 (11th Cir. 2006).  That rule found an exception in Missouri v. Seibert, 542 U.S. 600, 622 (2004) (holding that suppression of a post-warning confession is proper if "a two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning"), but there is no indication here–and defendant does not contend–that the officers deliberately used a two-step interrogation strategy to circumvent Miranda.

24

## VI.   <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [12] be **GRANTED** as to all pre-<u>Miranda</u> statements and **DENIED** as to all post-<u>Miranda</u> statements.

**SO RECOMMENDED**, this 21st day of January, 2014.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

25